IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

REGINALD MARCEL JOHNSON,

                    Petitioner,

          v.                                CASE NO. 18-3260-SAC

JEFF ZMUDA,

                    Respondent.


AMENDED MEMORANDUM AND ORDER

     This matter is a petition for habeas corpus filed under 28 U.S.C. § 2254. Petitioner challenges his 2008 conviction in the District Court of Sedgwick County, Kansas, for first-degree murder, alleging ineffective assistance of counsel and cumulative error.

     On April 6, 2022, the court entered a Memorandum and Order dismissing this matter. On April 11, 2022, petitioner filed a motion to reconsider his request to appoint counsel and a motion to extend the time to file a traverse. Petitioner is incarcerated outside of Kansas, and he tendered the motions to prison authorities on April 1, 2022, the date the traverse was due. Thereafter, the court denied the motion to reconsider, granted an extension of time to file the traverse, and reopened this matter. The court later granted a second extension, and petitioner's traverse was docketed on June 21, 2022.

     The court has considered the traverse and the record and enters this amended Memorandum and Order denying relief.

Procedural History

     On February 29, 2008, petitioner was convicted by a jury of first-degree murder. On April 4, 2008, he was sentenced to a term of

life without the possibility of parole for 25 years. Petitioner filed a direct appeal, alleging error by the district court in failing to instruct the jury on 'sudden quarrel' voluntary manslaughter. The Kansas Supreme Court (KSC) affirmed the conviction and sentence. *State v. Johnson*, 236 P.3d 517 (Kan. 2010).

On December 15, 2010, petitioner filed a motion for post-conviction relief under K.S.A. 60-1507 alleging various trial errors, including ineffective assistance of counsel. The trial court dismissed the motion without prejudice on April 8, 2011. On August 24, 2011, petitioner placed a new petition in the prison mailing system which was not file-stamped until September 9, 2011. On July 20, 2012, the district court held a hearing and orally denied relief. Petitioner appealed, and the Kansas Court of Appeals (KCOA) remanded the matter for an evidentiary hearing.  The district court conducted the hearing on May 22, 2015, and June 10, 2015, and denied relief in an order entered on October 20, 2015. Petitioner again appealed, and the KCOA affirmed the denial on September 1, 2017. The KSC denied review. *Johnson v. State*, 401 P.3d 184 (Table), 2017 WL 3836912 (Kan. Ct. App. Sep. 1, 2017), *rev. denied*, Apr. 25, 2018.

On June 18, 2018, petitioner filed a second motion under K.S.A. 60-1507 based on newly-discovered evidence. The district court summarily denied relief on July 17, 2018, and the KCOA affirmed the denial on May 15, 2020. *Johnson v. State*,462 P.2d 662 (Table), 2020 WL 2503264 (Kan. Ct. App. May 15, 2020), *rev. denied*, March 12, 2021.

**Factual background**

The KSC summarized the facts underlying petitioner's conviction as follows:

Johnson was at work on August 20, 2007, when his colleague,

Eddie Porter, approached him during their lunch break and
told him that Johnson needed to talk to Amy Whiteman,
Johnson's common-law wife. Johnson, suspicious that
Whiteman might be cheating on him, asked Porter if Whiteman
was "stepping out" on him. Porter confirmed Johnson's
suspicions, told him he needed to speak with her, and
provided Johnson with a name: Anthony.

Johnson received permission from his boss to leave work for
the rest of the day, called Whiteman, and asked that she
meet with him in a nearby parking lot. Johnson confronted
Whiteman, and she told him that Anthony was "just a friend."
Johnson, however, did not believe Whiteman and demanded
that she give him back his truck and move out of their house.
Whiteman suggested they go home and talk, but instead they
went to see her (and also formerly his) therapist.

They arrived at the therapist's office only to discover she
was unavailable, and again began discussing their situation
in the office parking lot. Johnson again asked Whiteman
about Anthony, and she continued to deny that Anthony was
anything more than a friend. Johnson told her to give him
her car keys and cell phone because both belonged to him.
He then told her that he would have her belongings waiting
for her in the front yard, "so there [was] no reason for
[her] to come in the house." Johnson then locked the vehicle
he had been driving and left in the truck Whiteman had been
driving. Johnson, who suffered from depression and had
previously attempted suicide, called his therapist and made
an appointment to see him that evening. He then drove home.
Whiteman called her friend Lisa Sandoval to pick her up and
take her home to get her clothes.

Johnson arrived home and started moving Whiteman's clothes
into the front yard. As he was doing so, he noticed a rose
and a card he had given to Whiteman the day before. "At that
point," Johnson testified, he "didn't want to live
anymore." He then retrieved his gun, planning on committing
suicide. Noticing Sandoval's car arriving in front of the
house, however, he instead put the gun in the closet by the
front door and went out to the front yard. Johnson there
again confronted Whiteman about her infidelity and their
relationship, while Sandoval waited in her car.

Sandoval reminded Whiteman and Johnson twice that their
son, Josiah, would be home from school soon and suggested
they remove Whiteman's belongings from the yard. Johnson
and Whiteman finally started carrying them back into the
house. Sandoval checked with Whiteman to make sure she was
okay before Sandoval left, and Whiteman indicated she was

fine. Johnson thanked Sandoval for bringing Whiteman home, said everything was going to be all right, and told her that he was not the "monster" Whiteman had portrayed him to be. Sandoval asked Whiteman to call her later and left.

Whiteman and Johnson continued moving Whiteman's belongings back inside. They also agreed that Whiteman would accompany Johnson to meet with his therapist that evening to discuss their situation and possible separation. They moved to the backyard and continued to talk about their problems. While there, Josiah arrived home from school. Johnson told Whiteman she needed to tell Josiah why they were separating. He told Josiah that his mother was sleeping with another man. Josiah indicated he did not want to move away and left to ride his bike around the neighborhood.

After Josiah left, the couple when back inside and continued talking. Eventually Johnson told Whiteman to pack up her things. Whiteman, however, saying she needed "closure" so she could "move on" told him she had been planning on moving out and had been having an affair with Anthony. Johnson told her he did not want to hear about it, but she continued, telling him she had slept with the man four times. Johnson told her he did not want to know any more and said, "could you just get your things now and leave?" Whiteman refused to leave and instead continued to provide details on the affair. Then, according to Johnson, his "heart started beating really fast, just pounding," his head started to hurt, and then everything went black. He did not remember getting the gun from the closet, did not remember hearing the shotgun "being discharged," never intended to hurt Whiteman, but simply wanted her to "get her things and leave." At some point, a noise at the door roused him, and he opened his eyes. Whiteman was lying on the floor. Fearing the noise at the door was Josiah coming home, he pulled Whiteman's body into the bedroom because he "didn't want [Josiah] to see his mom like that."

The State described those same events this way: Johnson silenced Whiteman "when he retrieved his Mossberg pump-action shotgun from the living room closet, pointed it at her, and shot her four times."

Johnson then went to a Wichita police station and informed officers there that he had hurt his wife. The police went to Johnson's house, found three shotgun shells and the shotgun on the floor of the living room, a trail of blood leading to a bedroom, and Whiteman's bloody body on the bedroom floor. The body was transported to the hospital, where Whiteman was pronounced dead from shotgun wounds to

the chest and thigh.

*State v. Johnson*, 236 P.3d at 518-19.

Additional facts are incorporated into the discussion.

### Standard of review

This matter is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under the AEDPA, when a state court has adjudicated the merits of a claim, a federal court may grant habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). In this context, an "unreasonable application of" federal law "must be objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations omitted).

The court presumes the correctness of the fact-finding by the state court unless petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See also Wood v. Allen*, 558 U.S. 290, 301 (2010) ("a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance").

These standards are intended to be "difficult to meet," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and they require that state court decisions receive the "benefit of the

doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

A habeas petitioner generally must exhaust available state court remedies before seeking federal habeas relief. "A threshold question that must be addressed in every habeas case is that of exhaustion." *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994). "The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a postconviction attack." *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994).

The presentation of a claim "requires that the petitioner raise in state court the 'substance' of his federal claims." *Williams v. Trammell*, 782 F.3d 1184, 1210 (10th Cir. 2015). A federal court can excuse exhaustion "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).

The procedural default doctrine provides an additional limit to review in habeas corpus cases. A federal habeas court may not review "federal claims that were procedurally defaulted in state court – that is, claims that the state court denied based on an adequate and independent state procedural rule" – unless the prisoner demonstrates either cause for the procedural default and resulting prejudice or that the failure of the federal court to review the claim will result in a fundamental miscarriage of justice. *Davila v. Davis*, 137 S.Ct. 2058, 2064-65 (2017); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Likewise, where a petitioner fails to present a claim in the state courts and would now be procedurally barred from presenting it if he returned to state court, there is an anticipatory procedural bar which prevents the federal court from addressing the claim. *Anderson v. Sirmons*, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007). As in the case of other procedurally defaulted claims, a petitioner's unexhausted claims barred by anticipatory procedural default cannot be considered in habeas corpus unless he establishes cause and prejudice for his default of state court remedies or a fundamental miscarriage of justice. *Gray v. Netherland*, 518 U.S. 152, 162 (1996).

To demonstrate cause for a procedural default, petitioner must show that some objective factor external to the defense impeded his ability to comply with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Objective factors that constitute cause include interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to [petitioner.]" *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (internal quotation marks omitted). A petitioner also must show "actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750.

A procedural default also may be excused if a petitioner can show that the failure to consider the defaulted claim would result in a fundamental miscarriage of justice. To proceed under this exception, a petitioner "must make a colorable showing of factual

innocence." *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000).
A petitioner seeking relief under a defaulted claim and asserting a
claim of innocence must show that "in light of new evidence, 'it is
more likely than not that no reasonable juror would have found
petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S.
518, 536-37 (2006)(quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### Discussion

Petitioner alleges errors by his trial counsel and the Kansas
Court of Appeals. These claims involve allegations of ineffective
assistance of counsel and the application of the governing standard.

Claims alleging ineffective assistance of counsel are analyzed
under the standards established in *Strickland v. Washington,* 466 U.S.
668 (1984). Under *Strickland*, "a defendant must show both that his
counsel's performance fell below an objective standard of reasonableness
and that the deficient performance prejudiced the defense." *United States
v. Holloway*, 939 F.3d 1088, 1102 (10th Cir. 2019) (internal quotation marks
omitted). There is "a strong presumption that counsel's conduct falls
within the wide range of reasonable professional assistance."
*Strickland*, 466 U.S. at 689.

The review of claims of ineffective assistance of counsel presented
in habeas corpus is deferential to the state courts. *See Harmon v. Sharp*,
936 F.3d 1044, 1058 (10th Cir. 2019). "When assessing a state
prisoner's ineffective-assistance-of-counsel claims on habeas
review, [federal courts] defer to the state court's determination that
counsel's performance was not deficient and, further, to the

attorney's decision in how to best represent a client." *Id.* (internal quotation marks and brackets omitted). Because both the standard of review under *Strickland* and under 28 U.S.C. § 2254 are "'highly deferential,'" habeas review of ineffective assistance claims is "'doubly so.'" *Jackson v. Warrior*, 805 F.3d 940, 954 (10th Cir. 2015)(quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). A federal court sitting in habeas "must defer both to counsel's strategic decisions about how best to represent his client and to the state court's determination that counsel's performance was not deficient." *Id.* Habeas relief is warranted only where a state court's disposition "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Id.* (quoting *Harrington*, 562 U.S. at 103).

**The claims**

By its order of September 30, 2021, the court dismissed grounds 1, 6, 9, 10, and 12. The court now addresses the remaining claims. **Ground 2.**

In this claim, petitioner argues the KCOA unreasonably applied the *Strickland* standard in deciding whether petitioner's trial counsel was ineffective in failing to object to hearsay statements by witness Lisa Sandoval. Petitioner alleges this failure prejudiced his case by allowing the jury to hear inflammatory hearsay.

At trial, Ms. Sandoval testified concerning a note that Ms. Whiteman showed her during the month of August 2007. Her testimony

reflected that Ms. Whiteman found the note on the table at her home, and that Ms. Whiteman stated that "if he [Mr. Johnson] ever found out I was cheating on him, he was going to kill me." Ms. Sandoval stated that Ms. Whiteman did not appear concerned about it and did not consider the note threatening. After the note was admitted into evidence, Ms. Sandoval was asked to read a part of the note into the record, and read "Warning, if you hurt me again, promise, I will hurt back in the worst way." The letter also stated, "Enough is enough."

On cross-examination, Ms. Sandoval testified that Ms. Whiteman's only concern was that Mr. Johnson would take his own life. Under questioning by petitioner's defense counsel, Ms. Sandoval testified that Ms. Whiteman never expressed any fear of petitioner, and that the only fear she expressed was that he would harm himself.

Following remand from the KCOA, the trial court conducted an evidentiary hearing and considered counsel's failure to object to hearsay evidence. Following that hearing, the trial court upheld counsel's decision to refrain from objecting. On appeal from that order, the KCOA stated:

> On remand, when asked if there was a reason why he did not object to Sandoval's testimony, Newton testified that Johnson wanted other favorable hearsay statements to come in:
>
> "All I could say is at the time Mr. Johnson was wanting other statements to also come in from Amy that were helpful to him, such as she wasn't afraid of him. She went along with him voluntarily. Those were other statements that he specifically wanted to get into evidence and my thought was that if we start objecting to hearsay early on, the judge is going to shut us all down and we will not be able to prove those points that Mr. Johnson wants us to prove."

Newton wanted Sandoval to testify that Whiteman was not worried that Johnson was going to hurt her because it would negate premeditation.

We now have the evidence the prior panel wanted. Newton did not object to the hearsay testimony because there was other hearsay testimony from Sandoval that was beneficial to the defense:

- Whiteman was not afraid of Johnson;

- Johnson was suicidal;

- Whiteman loved Johnson; and

- Whiteman stayed with Johnson voluntarily.

*Johnson v. State*, 2017 WL 3836912, at *9.

The KCOA concluded that petitioner's counsel made a reasonable tactical decision not to object to hearsay in Ms. Sandoval's direct testimony so that he could elicit from her on cross-examination the understanding of Ms. Whiteman that the threat in the note "to hurt back in the worst way" was that Mr. Johnson would commit suicide, not that he would harm Ms. Whiteman.

This court finds that the KCOA reasonably applied the *Strickland* standard in its decision, finding that counsel chose a tactic that would allow him to elicit hearsay testimony supporting the defense theory that petitioner was suicidal, not homicidal, and that the acts resulting in Ms. Whiteman's death were the result of sudden emotional turmoil rather than a premeditated killing. The tactic was within the range of latitude allowed under the *Strickland* standard, which requires a reviewing court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Petitioner is

not entitled to relief on this claim.

**Ground 3.**

Petitioner next argues the KCOA unreasonably applied *Strickland* in its review of his claim that trial defense counsel was ineffective in failing to thoroughly investigate petitioner's state of mind at the time of the shooting.

Petitioner points to a report prepared by Dr. Molly Allen that states petitioner "could be said to have a mental disease or defect that contributed to the crime in question", and he asserts that a thorough investigation by counsel would have identified mitigating evidence through Dr. Wayne Burns, Dr. Rhanda Magsalin, and Dr. Michael Burke. Plaintiff does not specify the evidence. He argues he was unable to present a complete defense without this evidence and suffered prejudice as a result.

The KCOA first found that petitioner's trial counsel developed a trial strategy to show the jury that petitioner shot his wife in the heat of the moment and not as a premeditated crime. To develop evidence, counsel interviewed lay witnesses and his investigator conducted other interviews. In particular, counsel asked Dr. Molly Allen to conduct a psychological evaluation of petitioner.

Dr. Allen's report discussed Johnson's depression, self-destructive behavior, and bouts of rage:

"Mr. Johnson acknowledges a history of self-destructive behavior on his part, and it appears that he has had a lot of difficulty dealing with rejection or disappointment, particularly in his relationship with [h]is wife. No doubt abandonment by his father early in life left Mr. Johnson with some insecurities. However, rather than trying to cope,

> adapt, and move on, he has tended to instead become overly self-focused and self-pitying, with significant bouts of depression and self-destructive behavior….
>
> Mr. Johnson most likely has had an affective disorder, and a character disorder, the latter of which is characterized by an individual having chronically disturbed relationships with others. In Mr. Johnson's case, this means that he lacks a stable sense of self and tends to be drawn to a chaotic and dysfunctional relationship with a primary partner. In this sense, he could be said to have a mental disease or defect that contributed to the crime in question."

*Johnson v. State*, 2017 WL 3836912, at *3.

At the evidentiary hearing on petitioner's motion under K.S.A. 60-1507, defense counsel testified that after he reviewed Dr. Allen's report, he believed her findings were not strong enough to successfully support a theory of mental disease or defect.

> The KCOA stated:
>
> The trial record shows ample evidence that Johnson had psychological issues and was suicidal on the date of the murder. This was introduced through other witnesses. Detective Thomas Fatkin testified that Johnson said he planned to shoot himself (not Whiteman) after he found out about the affair. Newton elicited from Lisa Sandoval and Eddie Porter on cross-examination that Johnson had suicidal ideations….
>
> *Johnson v. State*, 2017 WL 3836912, at *4.

The KCOA found that counsel made an informed choice not to pursue the defense of mental disease or defect and held that petitioner had not presented any relevant fact that counsel's investigation failed to identify.

Respondent points out that under *Strickland*, counsel's

"strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations." *Strickland*, 466 U.S. at 690-91.

In a related argument, petitioner asserted in a second filing under K.S.A. 60-1507 that his counsel erred in failing to disclose Dr. Allen's report to him. The district court rejected the claim, finding that the report was not exculpatory and that the claim was procedurally barred.

On appeal, the KCOA concluded that Dr. Allen's report did not undermine the jury's findings that petitioner intentionally shot his wife and that the act was premeditated. It also found that the report language cited by petitioner, namely, that "[i]n this sense, he could be said to have a mental disease or defect" was not exculpatory, because the report made that statement in the context of citing petitioner's lack of "a stable sense of self" and tendency to gravitate "to a chaotic and dysfunctional relationship with a primary partner." *Johnson v. State*, 2020 WL 2503264, at *4. Those characteristics, however, did not relieve petitioner from legal responsibility for his acts, as, explained the KCOA, the defense of a mental disease or defect would be availably "*only* if he lacked the ability to make the intentional act of shooting his wife intending to kill her." *Id*. at *5 (emphasis in original).

Here, counsel conducted an investigation of the petitioner's mental state in preparing a defense. However, when counsel determined that Dr. Allen's report did not provide a strong, favorable diagnostic finding concerning petitioner's mental health condition, he made an informed decision to focus the defense elsewhere. At trial, counsel developed evidence that petitioner was suicidal and argued that the shooting occurred in the heat of passion.

The court concludes the finding that counsel's strategy was sufficient to satisfy *Strickland* is reasonable. The defense advanced a theory that it could support before the jury after its investigation into a theory of mental disease or defect showed that defense was not sufficiently supported by the evidence. Petitioner is not entitled to relief on this claim.

**Ground 4.**

In this ground, petitioner claims the KCOA made an unreasonable determination of the facts because the record does not support the finding that counsel or his investigator interviewed witnesses Dr. Burns, Lisa Sandoval, and Eddie Porter.

First, the KCOA found that counsel's investigator interviewed Dr. Burns based on counsel's testimony in the hearing on petitioner's motion under K.S.A. 60-1507. This finding is incorrect. Dr. Burns testified at the evidentiary hearing that he had no contact with petitioner's defense counsel or his investigator prior to trial. Doc. 23-30, pp. 148-50.

Next, the KCOA found that counsel had not interviewed Ms.

Sandoval prior to trial. However, as explained in the discussion of Ground 2, he cross-examined her at trial and was able to establish that while Ms. Whiteman was concerned that petitioner might harm himself, she did not fear for her own safety. The KCOA found that, viewed in hindsight, counsel's failure to interview Ms. Sandoval was probably error. However, because counsel used cross-examination to elicit information favorable to the defense, the KCOA concluded that counsel's performance was not objectively unreasonable.

The KCOA's reference to hindsight here is significant, because the Supreme Court has explained, "We cautioned in *Strickland* that a court must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002)(citing *Strickland*, 466 U.S. at 689). Viewed in light of the evidence he established during cross-examination, counsel's performance was reasonable, and the KCOA did not err in its finding on that point.

Likewise, petitioner's co-worker Eddie Porter testified at petitioner's trial. On cross-examination by petitioner's counsel, he stated that he was concerned that petitioner would shoot himself after learning of Ms. Whiteman's infidelity. Mr. Porter also testified that he was not concerned that petitioner would harm Ms. Whiteman, explaining the petitioner was going to try to move forward and let Ms. Whiteman continue with the other man.

Both the trial court and the KCOA found that defense counsel reasonably represented petitioner by eliciting testimony that was beneficial to the petitioner's case at trial, and this court agrees. Petitioner has not shown that any failure of the defense to contact witnesses prior to trial resulted in prejudice to him, and he is not entitled to relief on this claim.

**Ground 5.**

Petitioner alleges his trial counsel provided ineffective assistance by failing to file a pretrial motion to suppress a handwritten letter written by the petitioner. The trial court and the KCOA rejected this argument, stating that the trial court admitted the note during trial, rejecting counsel's objection. The KCOA stated, in part:

> The trial court is correct. While it is true that Newton may not have had a strategic reason for failing to move to suppress the note pretrial, Johnson has not shown us that such a failure constitutes deficient performance. Newton designed his defense strategy to mitigate its effect if the note was admitted at trial. There was no prolonged discussion of the note, thus giving it increased significance to the jury because Newton lodged a simple objection. Newton said only, "I'm going to object. She's still not laid the proper foundation. And I believe the foundation provided by the [S]tate is insufficient to authenticate the letters." The court overruled the objection, and no more attention was drawn to the note by any further objection. Also, we must point out that Johnson had not established prejudice. Ultimately, the court ruled the note admissible, and Johnson has not persuaded us that a pretrial motion to suppress would have been successful in keeping it out when his objection during trial did not.

*Johnson v. State*, 2017 WL 3836912, at *10-11.

The court agrees the failure to move for pretrial suppression of the material was not ineffective assistance. As explained by the

KCOA, counsel unsuccessfully objected to its admission at trial, and there is no reason to think a pretrial motion would have been successful. Likewise, there is no showing that the admission of the note was prejudicial to the petitioner. Counsel used the note to elicit testimony that Ms. Whiteman feared petitioner would harm himself, supporting the defense theory. The state courts reasonably applied *Strickland* in finding this did not constitute ineffective assistance of counsel.

**Grounds 7 and 8.**

In these grounds, petitioner claims ineffective assistance of counsel based upon his counsel's failure to call two persons as witnesses at trial, Dr. Roxann Dicker, petitioner's family therapist and marriage counselor, and Dr. Wayne Burns, petitioner's psychotherapist.

The KCOA summarized counsel's explanation concerning Dr. Dicker as follows:

> Newton testified that he chose not to call Dr. Dicker because she had not seen Johnson in at least six months, "so her testimony wasn't current enough to offer us any assistance in what would have happened two to three months later." Newton testified that it "was pretty obvious when we talked to her she didn't like [Johnson] very much and so there was a concern that she would offer some negative testimony, in addition. I think she did intimate to us that she thought he had a rage disorder and explosive behavior." Dr. Wayne Burns, Johnson's psychotherapist, later confirmed that Dicker had referred Johnson to him, in part, because of her belief that Johnson had anger issues.
>
> Dr. Dicker did not testify at the K.S.A. 60-1507 motion hearing. The district court found that Newton was not deficient for failing to call Dr. Dicker as a witness at the trial, in part because Newton believed Dr. Dicker would have testified that Johnson had a rage disorder and

> explosive behavior. Such testimony would not have
> supported the defense but would have supported the State's
> theory of guilt, instead. The court's findings were
> supported by the testimony at the hearing. Based on the
> testimony provided, Newton's decision to not call Dr.
> Dicker was reasonable for fear that her testimony would
> hurt the defense.

*Johnson v. State*, 2017 WL 3836912, at *4.

Because of the likelihood that Dr. Dicker would testify that

petitioner had a rage disorder, the decision not to call her as a

witness was entirely reasonable and did not result in ineffective

assistance.

Concerning Dr. Burns, petitioner's counsel testified at the

hearing on petitioner's motion under K.S.A. 60-1507 that he chose not

to call Dr. Burns as a witness because he wanted to keep information

from his report stating that petitioner had a rage disorder from coming

before the jury.

Dr. Burns also testified at the motion hearing. The KCOA

summarized his testimony as follows:

> Dr. Burns testified that he was a psychotherapist and
> Johnson was his patient in 2007, referred to him by Dr.
> Dicker due to suicidal ideation, depression, and anger
> issues. During his sessions with Johnson, Dr. Burns did not
> see the anger issues present themselves. He explained that
> anger is always a secondary emotion. Johnson was dealing
> with a lot of frustrations and internalizing a great deal.
> His frustration had to do with some familial issues. But
> Dr. Burns never saw any signs of Johnson being violent
> towards others. Dr. Burns was just getting ready to delve
> into the potential anger issues when the therapy sessions
> stopped. Dr. Burns never saw any indication that Johnson
> was suicidal or had homicidal ideations in his three visits.
> Dr. Burns diagnosed Johnson with dysthymia.

*Johnson v. State*, 2017 WL 3836912, at *4-5.

The district court found counsel's assistance on this point was

reasonable, stating that counsel had investigated petitioner's mental health, had reviewed the report prepared by Dr. Burns, and had sought an additional report from Dr. Allen. It stated:

> While it is true that Dr. Burns said that [Johnson] did not present any anger issues as a primary emotion or homicidal ideations, he also indicated that the diagnosis was based on the limited input given by [Johnson]. [Johnson] purports to have had suicidal ideations when talking to other people, but denied suicidal ideations in his three meetings with Dr. Burns. This revelation would have undermined defendant's defense and his credibility at trial. This is the type of damaging testimony that Mr. Newton was trying to avoid by not calling Dr. Burns.

*Johnson v. State*, 2017 WL 3836912, at *5.

The KCOA found this reasoning persuasive, and this court agrees. The decision not to call Dr. Burns appears reasonable. In light of his statements at the motion hearing, it is, at best, unclear how his testimony concerning his sessions with petitioner would have supported the defense strategy.

In sum, counsel's decisions not to call Dr. Dicker and Dr. Burns as witnesses were a reasonable exercise of judgment and did not prejudice the defense. Petitioner is not entitled to relief on these claims.

**Ground 11.**

Petitioner next claims that trial counsel provided ineffective assistance when petitioner was compelled to testify due to counsel's failure to call witnesses.

Both petitioner and his trial counsel testified at the motion hearing and gave sharply different accounts of the reason for testifying.

Johnson contends that he told Newton before trial that he did not want to testify, but he felt compelled to because Newton told him it was necessary to explain Johnson's handwritten note and Newton did not call other witnesses on his behalf. Johnson said he had no plans to testify because "the golden rule is not to take the stand" in a murder trial. According to Johnson, after the State rested, Newton told him that he needed Johnson to testify to bring out a few points about the note. Johnson told him again that he did not want to testify. But Newton said that if Johnson did not testify "with those letters being produced, there's a good possibility that you will be convicted of first degree." So he unwillingly agreed to testify because Newton did not call other witnesses.

A totally different picture is drawn by Newton, who testified that it was Johnson's desire to testify. "He expressed that long before the trial and we discussed that long before the trial." Newton testified the "strategy" was for Johnson to testify. Johnson sat through the entire trial and made the choice to testify. Newton testified that Johnson had told him that the handwritten letter had a special meaning between only him and Whiteman. Newton believed only Johnson could explain that special meaning to the jury.…

In the State's opening statement, the prosecutor mentioned that Whiteman had received a threatening note from Johnson that stated he would "hurt back [Whiteman] in the wors[t] way" if he found out she was cheating on him. In his opening statement, Newton talked about the note:

> "[Y]ou're going to hear evidence that had a special meaning between him and Amy. And that was, that the wors[t] way Reginald Johnson could hurt Amy, was not taking her life, but by taking his own. And making her look into the eyes of their 10-year-old son, Josiah, and explaining to him why daddy is no longer with us. That's how he would hurt her in the wors[t] way possible. She would have to live with what she did."

*Johnson v. State*, 2017 WL 3836912, at *8.

After the prosecution rested, the trial judge advised petitioner that the decision whether to testify was his and encouraged him to discuss it with his counsel. Petitioner then took the stand. He testified concerning the meaning of his note to Ms. Whiteman and

explained that the threat to hurt her in the worst way was a reference to suicide.

During cross-examination, the prosecution asked petitioner to review a record from his first interview with Dr. Burns that brought out anger issues. Thus, the petitioner's testimony both put his defense before the jury and brought out material concerning his difficulty with anger management.

During the hearing on the motion under K.S.A. 60-1507, petitioner testified that he told counsel that Dr. Dicker and Dr. Burns could explain the meaning of his note and argued that if they had been called, it would not have been necessary for him to testify. Counsel testified, however, that while he did not call other witnesses to corroborate petitioner's testimony, other witnesses, in fact, ultimately did corroborate the point that the note was intended as a suicide threat.

The trial court noted that it had specifically informed petitioner that it was his decision whether to testify and that other witnesses could testify about what petitioner told them only if he testified. It concluded that petitioner had chosen to testify and found no ineffective assistance.

The KCOA concluded that counsel could not be held deficient, noting that petitioner had told the trial court that it was his decision to testify and noting the trial court's statement that it would be inadmissible hearsay for other witnesses to testify on what petitioner told them unless he testified. Finally, the KCOA stated

that it could not reweigh the testimony of witnesses.

The court agrees with this reasoning. The testimony of the petitioner and his counsel at the motion hearing presented conflicting versions of the decision, and the decisions of the state courts are supported by evidence in the record. There is no showing that the decisions are contrary to established federal law, and the decisions are a reasonable determination of the facts. Petitioner is not entitled to relief on this claim.

**Ground 13.**

Petitioner claims the KCOA erred in affirming the district court's decision denying his successive motion for relief under K.S.A. 60-1507.

As set out, petitioner filed a second motion under 60-1507 in the state district court asserting claims of ineffective assistance against his trial defense counsel arising from the failure to raise a defense based upon a mental disease or defect based upon the report prepared by Dr. Allen.

The district court denied the motion, finding that the report was not exculpatory and that the claim was untimely and successive.

On appeal, the KCOA reviewed petitioner's claims on their merits and concluded that the report prepared by Dr. Allen did not contain findings that would undermine the decision.

Likewise, while petitioner argued his attorney erred in failing to introduce the report to supplement the defense that he was guilty only of voluntary manslaughter, the KCOA found he had failed to show

how the report would establish a lack of intention or premeditation.

Finally, the KCOA rejected petitioner's argument that it was error for his counsel not to disclose the report to him because there was no showing that the use of the report could have changed the result of the trial.

This court finds no ground for relief in habeas corpus. Petitioner has not shown that the denial of relief in the petitioner's second motion under K.S.A. 60-1507 either unreasonably applied federal law or was an unreasonable determination of the facts. Instead, the KCOA evaluated the value of Dr. Allen's report in light of the state law under which petitioner was convicted. There is no error.

**Ground 14.**

Petitioner seeks relief on the ground that the cumulative effect of errors by his trial counsel denied him a fair trial.

"In the federal habeas context, a cumulative-error analysis aggregates all constitutional errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 915 (10th Cir. 2019) (internal quotation marks and citations omitted). "The applicant "must show that the cumulative effect of the errors determined to be harmless had a substantial and injurious effect or influence in determining the jury's verdict." *Id*. (internal quotation marks and citations omitted).

The cumulative-error doctrine applies only where there are two or more constitutional errors. *Jackson v. Warrior*, 805 F.3d 940, 955 (10ᵗʰ Cir. 2015)(citing *Thacker v. Workman*, 678 F.3d 820, 849 (10ᵗʰ Cir. 2012)).

In this case, the court has not found any constitutional error, and therefore, petitioner is not entitled to relief under a theory of cumulative error.

### Certificate of appealability

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability should issue "only if the applicant has made a substantial showing of the denial of a constitutional right," and the Court identifies the specific issue that meets that showing. 28 U.S.C. § 2253.

For the reasons set out in this order, the court finds petitioner has not made a substantial showing of the denial of a constitutional right and, therefore, declines to issue a certificate of appealability.

IT IS, THEREFORE, BY THE COURT ORDERED the petition for habeas corpus is dismissed and all relief is denied. No certificate of appealability will issue.

DATED:  This 12th day of July, 2022, at Topeka, Kansas.


S/ Sam A. Crow

SAM A. CROW
U.S. Senior District Judge